# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| NANCY ROOP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )     Case No.   09-cv-1051 |
| | ) |
| LINCOLN COLLEGE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

# O R D E R  &  O P I N I O N

Before the Court is Defendant's Motion for Summary Judgment (Doc. 23) filed on March 15, 2010. On April 19, 2010, Plaintiff filed her Response to Defendant's Motion for Summary Judgment (Doc. 28), and on May 7, 2010, Defendant Filed its Reply (Doc. 32). For the following reasons, Defendant's Motion for Summary Judgment is GRANTED.

### FACTUAL BACKGROUND[1]

Plaintiff, Nancy Roop, was employed as a full-time instructor of travel and tourism at Defendant Lincoln College ("Defendant College") from August 19, 1989 until June 12, 2007. (Doc. 28 at 2-3). During that time frame, Plaintiff was employed pursuant to annual academic contracts, as was part of Defendant's usual and normal practices. (Doc. 28 at 3, 7). In addition to being a full-time instructor, Plaintiff was also the Director and Coordinator of the Travel and Tourism School

---

[1] These background facts reflect the Court's determination of the undisputed facts, unless otherwise noted. Facts that are omitted are immaterial; if an included fact is immaterial to the Court's determination, this will be noted.

("TTS Director"), a position which entitled her to additional pay beyond that of an instructor. (Doc. 28 at 2).

Prior to 2006, all of the travel and tourism classes taught by Plaintiff were certificate level courses. (Doc. 28 at 3). However, at some point during the 2005-2006 academic year, Defendant College determined that it should offer a new bachelor's degree program in travel and tourism as part of Defendant College's new President, Dr. John Hutchinson's, initiative to create more degree programs at Defendant College. (Doc. 28 at 3). The decision to change the travel and tourism curriculum into a bachelor's degree program impacted Plaintiff in both her role as instructor and her role as TTS Director, beginning the course of events which has culminated in this lawsuit.

The first impact that the change had upon Plaintiff is that Plaintiff was told that she would have to obtain a master's degree—she had only obtained a bachelor's degree prior to that time—in order to continue teaching the travel and tourism courses. (Doc. 28 at 3). In an attempt to comply with this request, Plaintiff enrolled in an online master's degree program offered by Madison University (of Mississippi). (Doc. 28 at 4). Dr. Fansler wrote Plaintiff a letter of recommendation for this program, and Defendant College paid for all of Plaintiff's costs in obtaining the degree. (Doc. 28 at 3-4). Although Plaintiff successfully completed this program, however, on May 3, 2007, Dr. Fansler informed Plaintiff that Madison University was not an accredited institution,[2] and that therefore the master's

---

[2]The parties dispute when Dr. Fansler was aware of the fact that Madison University was not an accredited institution. According to Plaintiff, Dr. Fansler knew of this fact for a "long time" but did not tell Plaintiff until her previous

degree she received was not sufficient to fulfill the institutional requirement that professors of bachelor's level courses hold at least a master's degree.[3]  (Doc. 28 at 4).  Accordingly, Defendant College would not recognize the master's degree from Madison University, and asked that Plaintiff obtain another.  (Doc. 28 at 10).  Dr. Fansler and Plaintiff went on to discuss what accrediting bodies were acceptable.  (Doc. 28 at 4).

The other impact that the new bachelor's degree program had upon Plaintiff is that, in 2005, she was asked by Defendant College to create the new bachelor degree program in Tourism, Sport, and Hospitality Management.  (Doc. 28 at 8).  Over the next months, Plaintiff worked to create the program, often times reporting to Dr. Fansler and Dr. Hutchinson regarding the progress of her work.  (Doc. 29-2 at 26-37).  Plaintiff noted her work on the program when asking Dr. Fansler to write her a letter of recommendation for Madison University (Doc. 29-2 at 22-23).  In this letter, Plaintiff listed her responsibilities as including "Develop new courses to meet

---

contract had expired and she had finished creating the new bachelor program.  (Doc. 28 at 10).  Defendant disputes this allegation and states that Dr. Fansler became aware of the problem "only shortly before" notify the Plaintiff.  (Doc. 32 at 10).  The length of time Dr. Fansler knew of the problem, however, is immaterial as it does not in any way indicate that Plaintiff was discriminated against based upon her age, or that Defendant has engaged in copyright infringement.

[3] Plaintiff also disputes whether it was the practice of Lincoln College to require full-time faculty members to possess a minimum of a master's degree, especially because she served as a full-time faculty member for seventeen years before being asked to obtain one.  (Doc. 28 at 5).  The Lincoln College Faculty Handbook, effective May 2005, reads as follows: "Full-time College faculty members are expected to possess a minimum of an earned master's degree. Under certain circumstances, a faculty member may be hired with only a bachelor's degree.  In such cases, continued employment depends upon satisfactory progress toward an earned and appropriate advanced degree." (Doc. 29-2 at 8).  Accordingly, whether or not it was the College's policy before 2005 to require full-time faculty members to have earned or be in the process of earning a master's degree, it was undisputably the school's written policy at the time it asked Plaintiff to do so.

industry trends and changes," and asked Dr. Fansler to include in her letter of recommendation the fact that Plaintiff was "assisting [Dr. Fansler] in researching the development of a 3 + 1 Tourism degree program." (Doc. 23-2 at 23). In addition, in her 2006-2007 "Self-Evaluation" Plaintiff stated, as part of her plan of action for the upcoming year, that she would "continue to work on curriculum development and required paperwork for the new BS in Travel, Tourism, Hosp. Mgmt. degree preparing for submission to the [Higher Learning Commission] for approval." (Doc. 23-2 at 42). It appears that Plaintiff had completed her preparation of this program by May of 2007. (Doc. 28 at 9). Without assistance from Defendant College or an attorney, Plaintiff filed two copyright registrations for these curriculum materials in the summer of 2007. (Doc. 28 at 5).

Unfortunately, Plaintiff was no longer employed by Defendant College when the program went into effect. On May 1, 2007, Dr. Fansler sent Plaintiff a letter in order to "clarify the conditions of [her] employment with [Defendant] College." (Doc. 29-2 at 45). In this letter, Dr. Fansler informed Plaintiff that her master's degree from Madison University would not be recognized by Defendant College, and that she was expected to "[m]ake progress on earning a fully accredited Master's degree in [her] discipline" by May 2010. (Doc. 29-2 at 45). In addition, Dr. Fansler informed Plaintiff that another condition of her employment, amongst other things, would be to meet enrollment goals for the Tourism, Sport, and Hospitality Management program, which would be set by Defendant at a later date. (Doc. 29-2 at 45).

On May 9, 2007, Defendant College sent Plaintiff an Academic Contract for 2007-2008. (Doc. 29-2 at 47). The Academic Contract states that Plaintiff would be "expected to . . . make progress on earning a fully accredited Master's degree . . . by May 2010." (Doc. 29-2 at 47). It goes on to state: "To indicate acceptance on your part, please sign both copies and return one to the Business Office before May 18, 2007." (Doc. 29-2 at 47). Plaintiff's total cash salary and benefits would be $48,907. (Doc. 29-2 at 47). In addition, Defendant College attached an "Addendum to Supplement Base Contract" which provided that Plaintiff, in addition to her base contract, would "receive $8,301 for Program Director of and recruiting for the Tourism, Sports, and Hospitality Management Program." (Doc. 29-2 at 48). This form of contract (including the addendum) was substantially similar to the one signed by Plaintiff for the 2006-2007 academic year, under which Plaintiff earned $48,107 as her base salary and benefits, in addition to $8,301 for her position as Director and Coordinator of Travel and Tourism School. (Doc. 29-2 at 16-17).

Rather than sign and return the Academic Contract, on May 17, 2007, Plaintiff sent a letter to Dr. Fansler stating that "Under the current existing terms, conditions, and language stated in the [Academic Contract and its Addendum], I am unwilling to sign the contract at this time." (Doc. 28 at 4). Plaintiff further stated that she would be seeking legal advice regarding what she believed to be the College's breach of contract with respect to her master's degree. (Doc. 28 at 4). On May 18, 2007, Plaintiff sent a letter to Dr. Fansler and Jerry Crabtree[4] stating that she would not be teaching summer courses which were scheduled to begin the

_____

[4] The Court is not clear on the position held by Jerry Crabtree, however it is immaterial to its disposition of this action.

following week, and that she would be returning her office keys that day. (Doc. 28 at 4). Plaintiff alleges that she made multiple attempts to clarify the terms of the proposed contract with regards to recruitment and the obtaining of a second master's degree, but to no avail. (Doc. 28 at 10).[5] On June 4, 2007, Dr. Fansler sent Plaintiff a letter stating that "[i]n order for the College to plan for the Fall 2007 semester, I must know your intentions for continued employment with Lincoln College . . . If I do not hear from you by June 12, 2007, I will assume you have terminated your employment with the College." (Doc. 28 at 4-5). On June 15, 2007, Dr. Fansler sent Plaintiff another letter indicating that because they had not received Plaintiff's signed contract, it was Defendant College's understanding that Plaintiff had decided not to renew her contract. (Doc. 28 at 5). Plaintiff was 53 years old at the time her employment with Defendant College ended. (Doc. 28 at 5).

After Plaintiff was no longer employed with Defendant College, Defendant College asked Jeff Kratz, a faculty member in the business department, Stephanie Zimmerman, and Dr. Sally Pyne to teach the summer courses Plaintiff had been scheduled to teach. (Doc. 28 at 11; 32 at 16). At that time, Zimmerman was 30 years old, Kratz was 37 years old, and Pyne was approximately 49 years old.[6] (Doc. 28 at 11; 32 at 16). Ultimately, in 2009, Defendant College hired a 45 year old woman with a Ph.D. from the University of Mexico to fill the position of Director of

---

[5] Despite the fact that the parties appear to agree that several letters written from Plaintiff to Dr. Fansler regarding the proposed contract are on the record as exhibits to Plaintiff's deposition, neither party has filed them with the Court. (See Doc. 23-2 and Doc. 29-2). Rather, the only reference to these letters that appears on the record is Plaintiff's testimony regarding them in her deposition. (Doc. 23-1 at 35-40).

[6] Defendant only states that Dr. Pyne was born in 1958, and thus the Court does not know if she was 48 or 49 during the summer of 2007.

the Tourism Sport and Hospitality Program. (Doc. 23-2 at 4). According to Plaintiff, the materials used by these instructors to teach the courses were the same that she had prepared during 2005-2007, and which she copyrighted in the summer of 2007. (Doc. 28 at 11).

On February 9, 2009, Plaintiff filed her Complaint against Defendant, alleging violations of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.*, as well as the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (Doc. 1).

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. In ruling on a motion for summary judgment, the court must view the evidence on record in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Sciences Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant; however, the court is not required to draw every conceivable inference from the record. *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). The court draws only reasonable inferences. *Id.*

It is not the court's function to scour the record in search of evidence to defeat a motion for summary judgment. Instead, the court relies on the non-moving party to identify the evidence which creates an issue of triable fact. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (*quoting Greer v. Bd. of Educ.*, 267 F.3d 723,

727 (7th Cir. 2001). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). The party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific allegations, that there is a genuine issue of material fact that requires trial. *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Moreover, the evidence relied on must be competent evidence of a type that would be admissible at trial. *Id.*

At the summary judgment stage, however, the "court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts," such matters must be left for the jury. *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007). Accordingly, the summary judgment standard is applied "with special scrutiny to employment discrimination cases, which often turn on the issues of intent and credibility." *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491 (7th Cir. 2000).

**DISCUSSION**

## I. Age Discrimination

Plaintiff's first claim is that Defendant discriminated against her on account of her age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et. seq.* Under the ADEA it is unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because

of such individual's age." 29 U.S.C. § 623(a)(1). In order to succeed on a claim under the ADEA, Plaintiff "must prove by a preponderance of the evidence . . . that age was the 'but for' cause of the challenged employer decision." *Gross v. FBL Fin. Svcs., Inc.*, 129 S.Ct. 2343, 2351 (2009). That is, Plaintiff must show that her age "actually played a role in [Defendant's decision-making] process and had a determinative influence on the outcome." *Hemsworth*, 476 F.3d at 490 (*quoting Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003)). Plaintiff may do this through either the direct or indirect method of proof, although the distinction between these two avenues is somewhat "vague". *Id.* Here, Plaintiff attempts to avoid summary judgment under both methods, and the Court will consider them in turn.

**A. Direct Method of Proof**

"A plaintiff proceeding under the direct method survives summary judgment by creating triable issues as to whether discrimination motivated the adverse employment action of which [she] complains." *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009). Plaintiff may do this either through direct evidence, such as an admission by the decision-maker about a discriminatory animus, or through a longer chain of inferences. *Id.* For example, Plaintiff can establish an inference of discrimination via circumstantial evidence, such as: "1) suspicious timing, ambiguous oral or written statements, or behavior or comments directed at other employees in the protected group; 2) evidence . . . that similarly situated employees outside the protected class received systematically better treatment; and 3) evidence that the employee was qualified for the job in question

but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Id.* at 1114-15.

Plaintiff maintains that she suffered an adverse employment action when Defendant offered her an unreasonable contract for the 2007-2008 academic year. (Doc. 28 at 16). According to Plaintiff, the proposed contract was unreasonable because 1) she was not given a promotion from her previous position, as promised, 2) her base salary was not increased despite her receipt of a master's degree, 3) she was required to obtain a second master's degree in her discipline, and 4) the proposed contract was illusory because it contained an undisclosed recruitment quota, which Defendant failed to clarify despite Plaintiff's requests to do so. (Doc. 28 at 16).[7] Plaintiff has offered no evidence that Dr. Fansler, or anyone else at Defendant College, admitted to harboring any discriminatory bias on the basis of age, so the Court must examine whether she has put forth sufficient circumstantial evidence of discriminatory bias to demonstrate a genuine issue of material fact.

Plaintiff first appears to argue that circumstantial evidence of discriminatory intent exists in the form of suspicious timing and ambiguous oral statements. Plaintiff states that although Dr. Fansler and others at Defendant College were aware that Plaintiff was attending Madison University to obtain her master's degree, it was not until after she had completed this program, as well as the new curriculum for the Bachelor's Degree program in Tourism, Sports and Hospitality Management, that Dr. Fansler informed her that her degree from Madison

_____

[7] In the Court's opinion, these allegations boil down to two claims: 1) Defendant refused to recognize Plaintiff's master's degree from Madison University as a valid master's degree, and 2) Defendant sought to impose an unquantified recruitment quota onto Plaintiff as a duty of her position.

University was not acceptable. (Doc. 28 at 15). Further, Plaintiff states that Dr. Fansler waited to tell her this information until May 2007, despite the fact that Dr. Fansler knew Plaintiff's degree would not be recognized for a "long time." (Doc. 28 at 15). Even accepting Plaintiff's version of events as true, the Court cannot find that this sequence of events at all points to the conclusion that Defendant's decision not to inform Plaintiff that her degree would not be recognized was motivated by Plaintiff's age.[8] Plaintiff herself implies several arguments as to why Defendant may have waited to tell her, including that it was not until Plaintiff finished her master's degree that she would be entitled to a promotion, or that Defendant first wanted Plaintiff to first finish creating the bachelor's degree level Tourism, Sport, and Hospitality Management Program, however there is absolutely no indication that Defendant waited to tell her because of her age.

Nor does Plaintiff's next piece of circumstantial evidence, a remark by Dr. Fansler that the College was going to have to "do something about that contract of hers," add any inference of age discrimination. In order for remarks in the workplace to create an inference of discrimination upon an impermissible basis, the remarks should "reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria." *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997). Nothing in Dr. Fansler's remark about having to "do something" about Plaintiff's contract indicates in any way that she believed something had to be done

---

[8] Moreover, it is clear based upon the facts in the record that Madison University was not an accredited institution (Doc. 29-2 at 15), and that Defendant College did not recognize any master's degrees from unaccredited institutions (Doc. 28 at 8). Therefore there can be no argument that Defendant decided not to recognize Plaintiff's master's degree from Madison University because of Plaintiff's age.

because of Plaintiff's age. Plaintiff has not pointed to any remarks in which Dr. Fansler, or anyone else at Defendant College, indicated that they harbored an animus to employing older individuals,[9] and thus has not provided any circumstantial evidence of discriminatory intent.

Plaintiff also argues that the proposed contract itself is evidence of discrimination. (Doc. 28 at 16). However, in order to sustain this argument, Plaintiff would need to show that other individuals outside of the protected class were given contracts that treated them better than Plaintiff. Perhaps Plaintiff could accomplish this through her final argument, that no other similarly situated employee was required to recruit as a term of their employment or to obtain a second master's degree in their chosen discipline. (Doc. 28 at 16). However, Plaintiff has also failed to put on any evidence that this was the case. With regards to the recruiting quota, Plaintiff has submitted an affidavit of Terry Lowe, another faculty member at Defendant College, stating that "to the best of [his] knowledge" no other employee has had to meet an unquantified recruiting goal as a condition of their employment. (Doc. 28 at 12). However, there is no evidence that Mr. Lowe has actually seen any other faculty members' contracts, making his testimony inadmissible.[10] Moreover, even if Mr. Lowe did have personal knowledge of all of the other faculty member's contracts, he would have to allege that no other faculty

---

[9] In fact, Defendant has put on evidence that of the six other directors of programs at the College, three of them are older than Plaintiff, and two are within two years of Plaintiff's age. (Doc. 23-2 at 5).

[10] "Uncorroborated, self-serving testimony cannot support a claim if the testimony is based on 'speculation, intuition, or rumor' or is 'inherently implausible.'" *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009) (*quoting Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003).

member who was the *director of a brand new degree program* did not have to meet such requirement, in order for Plaintiff to show that she was treated differently than *similarly situated* employees outside of the protected class.

Likewise, with regards to whether any other employee was required to obtain a second master's degree in their chosen discipline, Plaintiff does not dispute that no employee of Defendant College since 2004 has been permitted to use a master's degree from an unaccredited institution for the purposes of employment as a full-time faculty member.  (Doc. 28 at 8).[11]  Plaintiff does argue that the two individuals who immediately replaced her were not required to have a master's degree in travel and tourism, however this argument is unavailing because those individuals were only employed as temporary replacements for Plaintiff, not full-time instructors of travel and tourism, or as the Director and Coordinator of the Travel and Tourism School or bachelor's degree level Tourism, Sport, and Hospitality Management Program, and are therefore not "similarly situated."  *See Bio v. Federal Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) ("a similarly situated employee is one who is directly comparable [to the plaintiff] in all material respects." (internal quotations omitted)).

Accordingly, Plaintiff has not put on any direct or circumstantial evidence of Defendant's discriminatory bias sufficient to demonstrate a genuine issue of material fact as to whether Defendant discriminated against her based upon her age, and her argument under the direct method of proof fails as a matter of law.

---

[11] Nor does she argue that Madison University was an accredited institution.

## B. Indirect Method of Proof

Under the indirect method of proof, Plaintiff may establish a prima facie case of age discrimination by showing that 1) she is over the age of forty; 2) her performance met Defendant's legitimate expectations; 3) despite her performance she was subject to an adverse employment action; and 4) Defendant treated similarly situated employees under the age of forty more favorably. *Martino v. MCI Communications Svcs., Inc.*, 574 F.3d 447, 453 (7th Cir. 2009). If Plaintiff satisfies these criteria, Defendant may provide a legitimate, non-discriminatory reason for its action. *Id.* If it does so, Plaintiff must then present evidence to show that Defendant's non-discriminatory reason was a pretext for discrimination. *Id.* However, the ultimate burden to prove intentional discrimination based upon Plaintiff's age always remains with Plaintiff. *Id.*

While Defendant concedes that Plaintiff is over the age of forty, it argues that Plaintiff has failed to establish every other element of her prima facie case. Namely, Defendant argues that Plaintiff did not suffer any adverse employment action, did not meet the College's legitimate expectations, and cannot prove that she was treated any differently than similarly situated employees. (Doc. 23 at 13). As discussed above, the Court finds that Plaintiff has failed to provide any evidence that Defendant treated similarly situated employees who were substantially younger than Plaintiff more favorably. The only additional argument made by Plaintiff in this regard as part of her indirect method of proof is that her ultimate replacement is ten years younger than her. Plaintiff claims that so long as her replacement was substantially younger than her, it is not dispositive that the

replacement was not under the age of forty. (Doc. 28 at 23 (citing *Hoffman v. Primedia Special Interest Publications*, 217 F.3d 522, 524 (7th Cir. 200)). However, Plaintiff has not put on any evidence that the new Director of the Tourism, Sport, and Hospitality Management Program was not required to recruit as a condition of her employment, and it is undisputed that the new director held a Ph.D. from the University of Mexico, an accredited institution. Accordingly, this argument also fails because Plaintiff has not shown that her replacement was treated more favorably than Plaintiff.

Because Plaintiff has failed to meet the fourth prong of her prima facie case, Plaintiff's indirect method of proof also fails as a matter of law. Accordingly, Defendant is entitled to judgment as a matter of law on Plaintiff's ADEA claim against it.

## II. Copyright Infringement

In addition to claiming age discrimination under the ADEA, Plaintiff has also brought a claim for copyright infringement against Defendant. (Doc. 1 at 5-9). Plaintiff's claim is based upon Defendant's alleged use of the curriculum and materials Plaintiff created for the new bachelor's degree level Tourism, Sport, and Hospitality Management Program, for which Plaintiff filed two copyright registrations in the summer of 2007 ("copyrighted curriculum materials"). (Doc. 1 at 5-9). Plaintiff's claim is based upon the Copyright Act of 1976, 17 U.S.C. § 101 *et. seq.* ("Copyright Act"). To establish a prima facie case of copyright infringement under the Copyright Act, Plaintiff must prove: 1) ownership of a valid copyright; and 2) copying of the constituent elements of the work that are original. *Feist*

*Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Defendant disputes that Plaintiff has established either of these two elements.  Because the Court finds that Plaintiff was not the owner of a valid copyright, Plaintiff's copyright infringement claim also fails as a matter of law.

Under the Copyright Act, ownership "vests initially in the author . . . of the work."  17 U.S.C. § 201(a).  "As a general rule, the author is the party who creates the work."  *Harris Custom Builders, Inc. v. Hoffmeyer*, 92 F.3d 517, 519 (7th Cir. 1996).  However, the Copyright Act also provides an exception to this general rule known as the "works made for hire" doctrine.  17 U.S.C. § 201(b).  As relevant here, the "works made for hire" doctrine provides that when an employee creates a work within the scope of her employment, the employer for whom the work was prepared is considered the proper author of the work.  17 U.S.C. §§ 101, 201(b).[12]  In determining whether a work was made with Plaintiff's scope of employment, the Court "must apply the general law of common agency."  *Vaughn v. Kelly*, 2007 U.S. Dist. LEXIS 51824, at *13 (N.D. Ill. 2007) (*citing Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 740-41 (1989)).  Specifically, this involves the consideration of whether the work 1) was of a kind Plaintiff was employed to perform; 2) occurred substantially within the authorized time and space limits; and 3) was actuated, at least in part, by a purpose to serve the master.  *Id.*

The parties dispute here centers on whether Plaintiff created the copyrighted curriculum materials within the scope of her employment with Defendant, and if so,

---

[12] It is undisputed that Plaintiff was an employee of Defendant College at the time the copyrighted materials were created.  (Doc. 28 at 2 ("Plaintiff was employed by Lincoln College from August 19, 1989 to June 12, 2007.")).

whether they nevertheless fall under a "teacher exception" to the "works made for hire" doctrine.

## A. Scope of Plaintiff's Employment

Defendant argues that Plaintiff's own admissions make clear that she created the copyrighted curriculum materials as one of her duties as the TTS Director. (Doc. 23 at 24-25).  Defendant points to memos prepared by Plaintiff in 1990 and 2000, in which she describes her position's duties as "writing curriculum and objectives" and "design and instruct curriculum . . . the selection of all instructional materials; annual curriculum update."  (Doc. 23 at 24).  However, as Plaintiff points out in her Response, Plaintiff's statements that she updated and selected curriculum in order to instruct travel and tourism courses on certificate level is not evidence that that she created the bachelor's degree level Tourism, Sport, and Hospitality Management Program as part of her employment.  (Doc. 28 at 27).

Still, Defendant has also put forward evidence of statements made or written by Plaintiff after she had begun to develop the copyright curriculum materials which indicate that she was doing so as part of her employment.  For example, in 2005, Plaintiff wrote to Dr. Fansler requesting a letter of recommendation for her entry into a master's degree program.  (Doc. 23-2 at 22-23).  In this letter, Plaintiff described her responsibilities as including "Develop new courses to meet industry trends and changes," and asked Dr. Fansler to include in her letter of recommendation the fact that Plaintiff was "assisting [Dr. Fansler] in researching the development of a 3 + 1 Tourism degree program."  (Doc. 23-2 at 23).  In addition, Defendant points out Plaintiff's 2006-2007 "Self-Evaluation" in which Plaintiff

states as part of her plan of action for the upcoming year that she "will continue to work on curriculum development and required paperwork for the new BS in Travel, Tourism, Hosp. Mgmt. degree preparing for submission to the [Higher Learning Commission] for approval." (Doc. 23-2 at 42). Not only has Plaintiff failed to respond to Defendant's argument that these statements indicate that she saw the creation of the copyrighted curriculum materials as part of her employment with Defendant College, there is also other evidence in the record that further solidifies this indication.

For example, in the same "Self Evaluation," Plaintiff writes that her latest contribution to Defendant College is that she researched and "developed a new degree for the college – B.S. in Travel, Tourism, and Hospitality Management." (Doc. 23-2 at 42). Also on the record are various emails from Plaintiff to Dr. John Hutchinson, President of Defendant College, and Dr. Fansler in which Plaintiff describes the work she is doing to develop the copyrighted curriculum. (Doc. 23-2 at 26-37). At the conclusion of one such e-mail to Dr. Hutchinson, Plaintiff states "Thank you for having faith in me to develop this new curriculum for LCN [Lincoln College at Normal]." (Doc. 23-2 at 28). Based upon this evidence, as well as the fact that Plaintiff was earning supplemental pay as the Director of TTS, the Court finds that Plaintiff developed the copyrighted curriculum materials as one of her duties of employment, within the authorized time and space of her employment, and in a desire to "serve her master." *See Vaughn*, 2007 U.S. Dist. LEXIS 51824, at *13-14. Accordingly, the development of the copyrighted curriculum materials occurred

within the scope of Plaintiff's employment as the Director of TTS at Defendant College.[13]

## B. Applicability of a "Teacher Exception"

Even if Plaintiff created the copyrighted curriculum materials within the scope of her employment, however, she argues that the "work for hire" doctrine should not apply to her because of a "teacher exception" to the rule. Plaintiff states that several courts, including the Seventh Circuit, have held that college and university professors may maintain ownership in their work, even if that work is completed within the scope of their employment. (Doc. 28 at 28). Plaintiff points the Court to the case of *Hays v. Sony Corp. of America*, 847 F.2d 412, 416 (7th Cir. 1988), to support this assertion. However, the Court finds that even if *Hays* does establish a "teacher exception" to the "work for hire" doctrine (which it does not do expressly) it is not applicable to the instant facts.

In *Hays*, the Seventh Circuit considered whether two high school teachers could claim a valid copyright in manual they prepared, on their own initiative, for students and other faculty members regarding the operation of the schools' DEC word processors. 847 F.2d at 412. In examining whether the manual belonged to the teachers or their academic institution, the Court discussed the "work for hire" doctrine of the Copyright Act in conjunction with the traditional, pre-Copyright Act,

_____

[13] Plaintiff's own self-serving assertions in her Response brief to the contrary are of no consequence. The party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by admissible evidence, that there is a genuine issue of material fact that requires trial. *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Plaintiff has not put forth any evidence that would create a question of fact as to whether she created the copyrighted curriculum materials in the scope of her employment.

concept that an academic writer was entitled to copyright his own writings – i.e., the "teacher exception." *Id.* at 416. The Seventh Circuit focused on "academic writings" and held that if it had to, it may decide that the "teacher exception" had survived the enactment of the Copyright Act, although it was not necessary to do so in the case at hand. *Id.* at 416-17. It also noted that a "possible textual handle" may be found in the requirement that a work for hire be created "*for* the employer." *Id.* at 417. The Seventh Circuit had "set to one side cases where a school directs a teacher to prepare teaching materials and then directs its other teachers to use the materials too." *Id.* at 416.

The Court finds that the potential "teacher exception" discussed by the Seventh Circuit in *Hays* is distinguishable from the instant case for several reasons. First, the copyrighted curriculum materials here are not "academic writings" akin to academic books or articles that a professor would typically submit for publication. *Id.* ("A college or university does not supervise its faculty in the preparation of *academic books and articles*, and it is poorly equipped to exploit their writings, whether through publication or otherwise." (emphasis added)). Instead, this appears to be more of a case in which Defendant College directed Plaintiff to prepare the curriculum materials, and expected other teachers to use them in the future. (See Doc. 28 at 27 where Plaintiff states that "[n]ot until 2005 was Plaintiff approached to create and develop the new bachelor degree program."). Moreover, as discussed above, it is clear from the evidence on the record that Plaintiff did in fact create the materials *for* Defendant College. (*See e.g.* Doc. 23-2 at 28 "Thank you for having faith in me to *develop this new curriculum for LCN* [Lincoln College at

Normal].” (emphasis added)). Accordingly, even if a “teacher exception” does exist in the Seventh Circuit, the copyrighted curriculum materials would not fall within it.

Because the copyrighted curriculum materials are a “work for hire” not within a “teacher exception,” Defendant College is the proper owner and Plaintiff has not proven the requisite ownership of a valid copyright. Therefore Plaintiff's copyright infringement claim also fails as a matter of law, and Defendant is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. The Clerk is DIRECTED to ENTER JUDGMENT against Plaintiff and in favor of Defendant. IT IS SO ORDERED.


CASE TERMINATED.


Entered this 14th day of March, 2011.


s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge
